IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

FRANKLIN B. REYES )
IDENTIFCATION NUMBER: 05846-007 )
UNITED STATES PENITENTIARY )
P.O. BOX 7000 )
FLORENCE, COLORADO 81226-7000 )
)
        **Petitioner,** )
)
v. )  Civil Action No.:_____
)
)
)
HECTOR RIOS, WARDEN )
UNITED STATES PENITENTIARY )
FLORENCE )
5880 STATE HIGHWAY 67 SOUTH )
FLORENCE, COLORADO 81226-7000 )
)
        **Respondent.** )
)

) ) ) ) )

**MEMORANDUM OF LAW IN SUPPORT OF PETITION
FOR A WRIT OF HABEAS CORPUS**

**NOW COMES** the Petitioner, Franklin B. Reyes (hereinafter, "the Petitioner" or "Mr. Reyes"), by and through his attorneys, Stuart J. Snyder and Stuart J. Snyder, P.A., and hereby respectfully submits this Memorandum of Law in support of Mr. Reyes Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. §2254 and/or 28 U.S.C. §2255.

**PROCEDURAL HISTORY**

By way of a three (3)-count indictment filed on February 21, 1996, the Petitioner, along with two co-defendants, Douglas A. Argueta and Carlos A. Alonzo, were charged

1

with pre-meditated first-degree murder while armed (in violation of District of Columbia Code §§ 22-2401, 3202), possession of a firearm during the commission of a crime of violence, (in violation of District of Columbia Code § 32-3204(b)) and carrying a pistol without a license, (in violation of District of Columbia Code § 22-3204(a)).

After a jury trial conducted before the Honorable Truman A. Morrison III, starting on October 15, 1996, and ending on October 28, 1996, Mr. Reyes was found guilty of first-degree murder while armed and of possession of a firearm during the commission of a crime of violence.[1]

On January 17, 1997, Mr. Reyes was sentenced to imprisonment of thirty (30) years to life on the first-degree murder conviction and five (5) to fifteen (15) years for the firearm possession. The sentences were run concurrently. On January 22, 1997, the Petitioner timely appealed his convictions to the District of Columbia Court of Appeals, which affirmed the same on June 25, 1999. (*See;* Opinion of District of Columbia Court of Appeals attached hereto as Exhibit #1, incorporated herein by reference and made part hereof.)

On July 30, 2001, Mr. Reyes filed a so-called "§23-110 Motion," claiming Heather Shaner, Mr. Reyes trial counsel was ineffective because she failed to (1) uncover and present an exculpatory defense witness and (2) draft and present to the jury an instruction regarding withdrawal from participation in a conspiracy. The Petitioner requested an evidentiary hearing be held on the claims of ineffective assistance of counsel. (*See;* §23-110 Motion attached hereto as Exhibit #2, incorporated herein by

---

[1.] Co-Defendant Argueta was acquitted on all counts. Co-Defendant Alonzo was convicted of first-degree murder and possession of a firearm during the commission of a crime of violence.

reference and made part hereof.) By an Order docketed on February 11, 2002, the Superior Court for the District of Columbia denied Mr. Reyes §23-110 Motion. Mr. Reyes filed a Motion seeking reconsideration of the February 11, 2002, Order, on April 18, 2002. This Motion for Reconsideration was denied.

Mr. Reyes next filed a timely appeal of the Superior Court's refusal to hear his §23-110 Motion (*See;* Appellant's Brief to the District of Columbia Court of Appeals attached hereto as Exhibit #3, incorporated herein by reference and made part hereof.), but was unsuccessful on appeal. (*See;* Opinion of District of Columbia Court of Appeals attached hereto as Exhibit #4, incorporated herein by reference and made part hereof.)

Having exhausted all available remedies available to him in the District of Columbia "State" Court System, Mr. Reyes files the instant Petition in the time period prescribed by Federal Law.

## STATEMENT OF FACTS

The Government alleged on September 9, 1995, at approximately 10:00 p.m., Mr. Reyes, his girlfriend Xiorama Ruiz, Douglas Argueta, and Carlos Alonzo were in a car traveling on Columbia Road looking for Mr. Sorto (the victim of the shooting that led to Mr. Reyes conviction). Mr. Argueta was driving and Ms. Ruiz was sitting on the front passenger seat. Earlier the same day Mr. Reyes had spoken to Mr. Alonzo about procuring a 9-millimeter gun and, according to the Government, elicited his agreement that they would "do it" that evening -- presumably referring to some form of attack on Mr. Sorto.[2]

---

[2] The government theory at trial was that Mr. Reyes was seeking revenge based upon Mr. Sorto previously shooting Mr. Reyes. Mr. Sorto was not arrested or charged with respect to this incident.

3

As the afore-mentioned group drove down Columbia Road, N.W., Mr. Reyes and Co-Defendant Alonzo spotted Mr. Sorto leaving a Foot Locker store and in the company of a young woman, walking to a Popeye's Restaurant located nearby. Mr. Reyes, who had removed the loaded revolver he had brought with him from the armrest of the car, then said: "No, no, no. Fuck it. There are too many police around, too many people. Let's go. Let's go." Upon hearing this, Mr. Alonzo became upset and grabbed the gun away from Mr. Reyes. And directed Mr. Argueta to move his seat forward and roll down the window. Mr. Argueta complied with this directive, after which Mr. Alonzo shot and killed Mr. Sorto.

Mr. Reyes testified in his own defense presented a different version of events than offered by the Government. Mr. Reyes stated that on September 9, 1999, at approximately 7:00 p.m., he drove his mother, brother and girlfriend, Ms. Ruiz, to a party at 11th and N Streets, N.W. After dropping off his mother and brother, Mr. Reyes further testified he and Ms. Ruiz saw Mr. Alonzo on the street and stopped to talk to him. Mr. Alonzo needed a ride to Columbia Road and they agreed to give him one. First, however, Mr. Reyes drove to Arlington, Virginia to show his cousin, Mr. Argueta, his car because his cousin was interested in buying it. After visiting Mr. Argueta and showing him the car, Mr. Argueta joined the group on the trip back to Washington to drop Mr. Alonzo off at Columbia Road. Mr. Argueta drove and Ms. Ruiz sat in the front passenger seat. Mr. Alonzo sat behind Ms. Ruiz and Mr. Reyes sat behind Mr. Argueta.

Mr. Reyes further presented evidence that when they arrived at Columbia Road, Mr. Alonzo directed Mr. Argueta to park the car in front of the Safeway and requested they wait for him. When Mr. Alonzo did not return after about five (5) minutes, Mr.

Reyes got out of the car to look for him.  Shortly after, Mr. Reyes saw Mr. Alonzo talking to Mr. Sorto and then walking back to the car, apparently angry.  Mr. Reyes and Mr. Alonzo resumed their positions in the back seat of the car, and Mr. Alonzo directed Mr. Argueta to drive towards Mr. Sorto.  As they approached him, Mr. Alonzo told Mr. Argueta to roll down his window and he proceeded to shoot at Mr. Sorto.  After the shooting, Mr. Alonzo was dropped off at 11th and M Streets, N.W., and the others went home.

Counsel for Mr. Alonzo elicited testimony on cross-examination from an investigating detective that Ms. Ruiz, Mr. Reyes' girlfriend, told him that a Tony Gonzalez had murdered Mr. Sorto.  Further testimony elicited complicated the issues at trial, in that during a subsequent interview, Ms. Ruiz reiterated that a Mr. Gonzalez committed the murder, but allegedly identified a photograph of Mr. Reyes as Gonzalez.  In closing, counsel for Mr. Alonzo argued that Mr. Reyes and Ms. Ruiz, as well as Mr. Argueta, were responsible for Mr. Sorto's murder and that their testimony was intended to "protect themselves, and each other."

Based upon the trial records numerous, in the light most favorable to the Government, indications that Mr. Reyes had withdrawn from participation in the shooting, Mr. Reyes trial counsel requested the jury be given an instruction on the issue of withdrawal.  The trial court did not deny this request, rather, the Judge asked Mr. Reyes trial attorney to draft a proposed jury instruction for consideration.  The Petitioner's trial counsel failed to submit such an instruction, and consequently no such instruction was given.

Mr. Reyes conviction followed the trial.[3]

On his direct appeal the Petitioner was represented by Benjamin Klubes. Mr. Reyes advised Mr. Klubes of his desire to pursue a claim for ineffective assistance of counsel at his trial. The Petitioner's appellate lawyers, however, provided Mr. Reyes with incomplete and misleading information about the effect pursuing such claims on direct appeal might have. As a result, the Petitioner was discouraged from pursuing any claim for ineffective assistance of counsel and, more importantly to the issues herein, improperly advised that he could file a motion challenging trial counsel's conduct although the standard of review on appeal, where the trial court to deny such a motion, would be stricter than if the motion is raised now. (*See;* letter of Benjamin Klubes to the Petitioner attached hereto as Exhibit #5, incorporated herein by reference and made part hereof.)

As a result of his failure to raise the ineffective assistance of counsel claim on direct appeal, the Petitioner was barred from doing so in his §23-110 Motion.

Further facts will be set forth as they relate specific arguments raised herein.

## THE LAW AND LEGAL ARGUMENT

The Sixth Amendment to the United States Constitution guarantees all criminal defendants the right to the assistance of counsel.[4] *See; Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed 2d 674 (1984); *United States v. Cronic,* 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed 2d 657 (1984).. "[T]he right to counsel is the right to the

---

[3] Interestingly, the only person who did not present any eveidence at the trial, Mr. Argueta, was the only co-defendant acquittted.

[4]. The Sixth Amendment provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right ⋯ to have the Assistance of Counsel for his defence."

effective assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

Under *Strickland,* to prevail on a claim of a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must satisfy a two-pronged test: he must show that trial counsel's performance was deficient and that the deficient performance prejudiced the defense. 466 U.S. at 687, 104 S.Ct. 2052. *See also Wiggins v. Smith,* 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). To prove the performance prong of the *Strickland* standard, the petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Williams v. Taylor,* 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (*quoting Strickland, supra,* 466 U.S. at 687, 104 S.Ct. 2052). The evidence must show that counsel's representation " 'fell below an objective standard of reasonableness.' " *Wiggins, supra,* 539 U.S. at 521, 123 S.Ct. 2527 (quoting *Strickland, supra,* 466 U.S. at 688, 104 S.Ct. 2052).

In assessing the performance prong of an ineffective assistance of counsel claim under the Sixth Amendment, a court will "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland, supra,* 466 U.S. at 689, 104 S.Ct. 2052. The court must be highly deferential in reviewing counsel's performance, in order to avoid " 'second-guess[ing] counsel's assistance." <u>quoting</u> *Strickland, supra,* 466 U.S. at 689, 104 S.Ct. 2052). Until proven otherwise, the court presumes that counsel's representation was professionally competent, and that it "derived not from error but from trial strategy." In *Strickland,* the Court explained strategic choices made after thorough investigation of law and facts

7

relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. 466 U.S. at 690-91, 104 S.Ct. 2052. *See also Wiggins, supra,* 539 U.S. at 521-22, 123 S.Ct. 2527.

To satisfy the prejudice prong of *Strickland,* a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 205.  The ultimate inquiry is whether "counsel's errors were so serious as to deprive [the petitioner] of a fair trial, a trial whose result is reliable." quoting *Strickland, supra,* 466 U.S. at 687, 104 S.Ct. 2052.

The instant matter does not present some mere bald allegation of inadequacy of counsel and it does not amount to an attack on trial counsel's tactics; rather this Petition states valid grounds for relief.  The fundamental right to a fair trial requires the thorough investigation of the evidence in a case by a defendant's attorney and the reasonable expectation that an attorney will be prepared to defend the allegations made against a defendant.  In any case, let alone a serious violent felony charge, the basic failure of both

8

Mr. Reyes trial counsel and counsel on his direct appeal go to the very essence of effectively representing a client.

Presented with an opportunity to personally draft a favorable jury instruction based upon the evidence admitted at trial, Mr. Reyes trial counsel plainly ignored the chance. There is no strategy involved in such a position and it clearly demonstrates neglect in representation. The indisputable fact the trial judge did not deny the request when it was initially made proves this. If there was no basis for the instruction, the trial judge would not have asked the Petitioner's trial counsel to draft a jury instruction. By not presenting any such jury instruction, the Petitioner's trial counsel blotted out the essence of Mr. Reyes best defense in this matter based on the Government's theory of the case and destroyed any chance of effectively arguing an important defense that was clearly developed during the trial. Quite simply, the failure to submit a jury instruction and advocate it being given to the jury constitutes *per se* ineffective assistance of counsel.

It cannot be disputed that under the Due Process and Equal Protection Clauses, there exists a right to counsel on appeals as of right. In *Evitts v. Lucey*, 469 U.S. 387 (1985)., the Supreme Court made clear that in proceedings where the right to counsel on appeal does apply, this right includes the right to effective assistance of counsel.

Mr. Reyes received ineffective assistance of counsel from his appellate attorney, on his direct appeal to the District of Columbia Court of Appeals, when his attorney advised him not to raise an ineffective assistance claim during his direct appeal. Ineffective assistance of counsel may constitute cause when that ineffectiveness itself is the very reason why such claims were not made on direct appeal. *See; McCleskey v. Zant,* 499 U.S. 467 (1990).

9

It is important to note here, the Petitioner was a very young man at the time of his appeal, born in a foreign country, speaking little or no English and almost completely unfamiliar with the U.S. legal system.  The Petitioner clearly advised his direct appeal attorney that he wished to pursue a claim of ineffective assistance of counsel at trial.  In response, Mr. Reyes received Exhibit # 5 to this Memorandum. **An inarticulate letter written in English** which suggests making a claim for ineffective assistance of counsel would delay the appeal.  The letter goes on to state:  "In the event the Court of Appeals affirms your convictions, and we have explained to you that there is a very strong likelihood that will occur in this case, you may file a motion challenging Ms. Shaner's conduct although the standard of review on appeal, where the trial court to deny such a motion, would be stricter than if the motion is raised now." *See;* Exhibit # 2

At best this advice to Mr. Reyes was unclear and misleading and caused Mr. Reyes to lose a valuable right of review on his appeal.  It is obvious the advice to give this avenue of review cannot be considered a tactical decision.  The fact that Mr. Reyes relied on this advice to detriment is clear and constitutes *de facto* ineffective assistance by the Petitioner's direct appeal attorney

The deficiencies of both Mr. Reyes trial attorney and direct appeal attorney were so severe that each ceased to act as "counsel" as that word is understood in the context of the Sixth Amendment, the Due Process Clause and Equal Protection Clause respectively.

## CONCLUSION

For the reasons stated in the Petitioner's Motion for Post conviction Relief, this Memorandum of Law and any arguments advanced at a hearing on the afore-mentioned Motion, the Petitioner respectfully submits substantial grounds for relief exist and

respectfully requests this Honorable **GRANT** him the relief sought in the Petitioner's Motion and **GRANT** him any other, or further, relief this Honorable Court deems appropriate and the interests of justice require.

                    Respectfully Submitted,

                    _____

                    Stuart J. Snyder
                    STUART J. SNYDER, P.A.
                    One North Charles Street
                    Suite 1104
                    Baltimore, Maryland 21201
                    (410) 539-0375